ARLAN'S DEPARTMENT STORE OF LOUISVILLE,
INC., ET AL. *v.* KENTUCKY.

No. 503.   Decided December 17, 1962.

*James E. Thornberry* and *Edward M. Post* for appellants.

*John B. Breckinridge,* Attorney General of Kentucky, *Holland N. McTyeire,* Assistant Attorney General, and *Chas. E. Keller* for appellee.

PER CURIAM.

The motion to dismiss is granted and the appeal is dismissed for want of a substantial federal question.

MR. JUSTICE DOUGLAS, dissenting.

This is a criminal prosecution of the owners of three retail stores for employing persons in their businesses on Sunday.[1]   Each was fined $20 and costs and the convic-

---

[1] Kentucky Rev. Stat. § 436.160 reads in relevant part as follows:

"(1) Any person who works on Sunday at his own or at any other occupation or employs any other person, in labor or other business, whether for profit or amusement, unless his work or the employment of others is in the course of ordinary household duties, work of necessity or charity or work required in the maintenance or operation of a public service or public utility plant or system, shall be fined not less than two dollars nor more than fifty dollars.   The employment

tions were sustained (357 S. W. 2d 708) against the claim that the laws violated the First Amendment, applicable to the States by reason of the Fourteenth Amendment. The case differs from *Braunfeld* v. *Brown,* 366 U. S. 599, and *Gallagher* v. *Crown Kosher Market,* 366 U. S. 617, in that those who actually observe the Sabbath on a day of the week other than Sunday are exempt from the penal provisions.[2] But as I indicated in my dissent in *McGowan* v. *Maryland,* 366 U. S. 420, 561, the unconstitutionality of Sunday laws strikes much deeper. By what authority can government compel one person not to work on Sunday because the majority of the populace deems Sunday to be a holy day? Moslems may someday control a state legislature. Could they make criminal the opening of a shop on Friday? Would not we Christians fervently believe, if that came to pass, that government had no authority to make us bow to the scruples of the Moslem majority?

I said in my dissent in the *McGowan* case:

"... it is a strange Bill of Rights that makes it possible for the dominant religious group to bring the minority to heel because the minority, in the doing of acts which intrinsically are wholesome and not antisocial, does not defer to the majority's religious beliefs. Some have religious scruples against eating pork. Those scruples, no matter how bizarre

---

of every person employed in violation of this subsection shall be deemed a separate offense.

"(2) Persons who are members of a religious society which observes as a Sabbath any other day in the week than Sunday shall not be liable to the penalty prescribed in subsection (1) of this section, if they observe as a Sabbath one day in each seven.

"(3) Subsection (1) of this section shall not apply to amateur sports, athletic games, operation of moving picture shows, chautauquas, filling stations or opera."

[2] *Id.,* subsection (2).

they might seem to some, are within the ambit of the First Amendment. . . . Is it possible that a majority of a state legislature having those religious scruples could make it criminal for the nonbeliever to sell pork? Some have religious scruples against slaughtering cattle. Could a state legislature, dominated by that group, make it criminal to run an abattoir? . . . A legislature of Christians can no more make minorities conform to their weekly regime than a legislature of Moslems, or a legislature of Hindus. The religious regime of every group must be respected—unless it crosses the line of criminal conduct. But no one can be forced to come to a halt before it, or refrain from doing things that would offend it. That is my reading of the Establishment Clause and the Free Exercise Clause." 366 U. S., at 575.

The religious nature of this state regulation is emphasized by the fact that it exempts "members of a religious society" who actually observe the Sabbath on a day other than Sunday. The law is thus plainly an aid to all organized religions, bringing to heel anyone who violates the religious scruples of the majority by seeking his salvation not through organized religion but on his own.

I see no possible way by which this law can be sustained under the First Amendment.

". . . if a religious leaven is to be worked into the affairs of our people, it is to be done by individuals and groups, not by the Government. This necessarily means, *first,* that the dogma, creed, scruples, or practices of no religious group or sect are to be preferred over those of any others; *second,* that no one shall be interfered with by government for practicing the religion of his choice; *third,* that the State may not require anyone to practice a religion or even any

religion; and *fourth,* that the State cannot compel one so to conduct himself as not to offend the religious scruples of another. The idea, as I understand it, was to limit the power of government to act in religious matters . . . not to limit the freedom of religious men to act religiously nor to restrict the freedom of atheists or agnostics." 366 U. S., at 563–564.